# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## WESTERN DIVISION

Richard Elson,                                         Case No. 3:11-CV-00183-JGC

     Plaintiff,                              :        JUDGE JAMES G. CARR

v.                                                              MAGISTRATE JUDGE ARMSTRONG:

Commissioner of Social Security,             :        **MAGISTRATE'S REPORT AND**
                                                                 **RECOMMENDATION**

     Defendant.                             :

     Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 1383(c)(3) of Defendant's final determination denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act (Act), 42 U. S. C. §§ 1382, 1382c.  Pending are the parties' briefs on the merits (Docket Nos. 12, 13 and 14).  For the reasons that follow, the Magistrate Recommends that the Commissioner's decision be Affirmed in part and Reversed and Remanded in part.

## I, Procedural Background

     On October 1, 2007, Plaintiff Richard Elson applied for SSI pursuant to 42 U. S. C. §§ 1382, 1382c, stating that he has been disabled since April 12, 2006.  (Tr. 80-86).  Plaintiff's application was denied initially, February 5, 2008, and upon reconsideration, April 9, 2008. (Tr. 37-39).  On May 28, 2008, Plaintiff filed a written request for a de novo hearing before an ALJ pursuant to 20 C.F.R. § 416.1429, et seq. (Tr. 39,

46, 53).  On June 26, 2009, Plaintiff Elson appeared with counsel Steven Perlmutter and testified at an administrative hearing before ALJ Hugh S. Atkins.  (Tr. 20-36).  Medical Expert (ME), John Ruggiano, M.D., a psychiatrist certified by the American Board of Psychiatry and Neurology also testified at that hearing.  (Tr. at 20-22, 28-32, 75, 77).

On September 18, 2009, the ALJ Atkin's issued a written decision denying Mr..Elson's disablility claim.  (Tr. 9-19).  Plaintiff sought review of the ALJ's decision.  (Tr. 8).  On December 8, 2010 the Appeals Counsel denied Plaintiff's request for review, thereby making the ALJ decision final.  (Tr. 1-5).

Thereafter, on January 26, 2011, Plaintiff filed his Complaint with this Court.  (Docket No. 1).

## II. Jurisdiction

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  McClanahan v. Commissioner of Social Security, 474 F.3d 830, 832-33 (6th Cir. 2006).

## III. Legal Issues

Plaintiff raises the following issues before this Court for review:

1.  Does substantial evidence support the ALJ's finding that Plaintiff, Richard Elson, did not have a medically determinable psychiatric impairment?

2. Does substantial evidence support the ALJ's evaluation of non-examining State-agency psychologist Dr. Meyer's February, 2008 opinions?

3.  Does substantial evidence support the ALJ's evaluation of examining Agency psychologist Dr. Layne's January, 2008 opinions?

4.  Does substantial evidence support the ALJ's evaluation of  medical expert Dr. Ruggiano's June, 2009 testimony?

5. Did the ALJ erroneously fail to evaluate Plaintiff's condition prior to his October 1, 2007 application date?

6. Does substantial evidence support the ALJ's evaluation of treating physician Dr. Rizk's October, 2005 opinions?

7. Does substantial evidence support the ALJ's evaluation of non-examining State-agency psychologist Dr. Wagner's December, 2006 opinions?

Defendant condenses the issues raised before this Court for review to two.

1. Did substantial evidence support the ALJ's residual functional capacity finding, and the weight he gave to the medical source opinions?

2. Did substantial evidence support the ALJ's finding that a significant number of jobs accommodated Plaintiff's vocational profile and residual functional capacity?

## IV. Relevant Facts

### Plaintiff's History

Plaintiff Richard Elson was 52 years old on the date of the ALJ's decision.  (Tr. 80).  He graduated from high school.  (Tr. 105).  His past relevant work included lawn care and tree service laborer, each requiring medium or heavy exertion.  (Tr. 92-95, 102-03).

### Plaintiff's Medical History

#### December 10, 2007

On December 10, 2007, Plaintiff had an x-ray that showed he had degenerative changes of his lumbar spine, and mild disc narrowing.  (Tr. 263, 270).

#### December 11, 2007, Dr. Trivedi, M.D.

On December 11, 2007, Rekha T. Trivedi, M.D., an examining physician, evaluated Plaintiff's physical condition.  (Tr. 264-69).  Dr. Trivedi found that Plaintiff complained of low back pain that started in 2007 while carrying an object.  (Tr. 264).  Plaintiff had no surgery or back brace, and took no medication.  (Tr. 264).  Plaintiff told Dr. Trivedi that he had a history of

3

incarceration for nineteen years, with release in April 2002. (Tr. 264). Plaintiff worked as a laborer from 2003 to 2005. (Tr. 264). Plaintiff complained of back pain and left leg numbness, and a history of seizure in 2005. (Tr. 265). He denied taking any medication since 2005. (Tr.265).

On examination, Dr. Trivedi found Plaintiff had no significant abnormalities, and normal straight leg raising, normal to good muscle strength in most areas, and normal ranges of motion in the joints and spine, except for some minimal reduction in back flexion (70/90 degrees) and knee flexion (120/150 degrees). (Tr. 265-68). Plaintiff's gait on a level surface was antalgic on the left without an ambulatory aid; however, he was able to rise from a chair, but unable to walk on his heels and toes. (Tr. 268). He was able to reach overhead. (Tr. 268). Plaintiff's neurological examination was intact, with normal orientation, speech, memory, sensory responses and reflexes in the upper extremities and lower right extremity. (Tr. 268). Plaintiff had slightly reduced sensory responses and reflexes in the lower left leg. (Tr. 268). Plaintiff's lumbar spine showed some mild disc space narrowing. (Tr. 268). An electromyogram showed no neuropathy or radiculopathy in Plaintiff's left lower extremity. (Tr. 269). Dr. Trivedi concluded that Plaintiff demonstrated some sensory impairment, weakness, and gait impairment in the left lower extremity, and had normal hand function except for some left-hand grasp weakness (Tr. 269).

**January 17, 2008, Dr. Layne, Ph.D.**.

On January 17, 2008, Christopher Layne, Ph.D., an examining psychologist, evaluated Plaintiff's mental condition. (Tr. 271-78). Plaintiff told Dr. Layne that two years earlier he had a history of a subdural hematoma (bleeding on his brain), underwent a surgical procedure to remove the pressure on his brain, and had residual numbness and weakness in his left hand and leg. (Tr. 271). Plaintiff showed some signs of brain damage, with slow, halting but understandable speech and sluggish gestures. (Tr. 273). Plaintiff showed no signs of anxiety, no obsessions, paranoia or delusions, and no hypochondria or exaggeration. (Tr.

4

273).  Plaintiff had adequate alertness and orientation, and his memory was adequate.  (Tr. 273).  Plaintiff's intelligence testing showed a normal intellect.  (Tr. 274).  He had a low-average memory, and normal reading, spelling, and math achievement.  (Tr. 274).  Dr. Layne concluded that Plaintiff had an adequate ability to understand and follow instructions, sustain concentration, attend to repetitive tasks, relate to co-workers, and withstand stress.  (Tr. 275).

In January, 2008, Agency examining psychologist Dr. Layne diagnosed a personality disorder based on his clinical examination.  (Tr. 272-75.).  Dr. Layne opined that Elson had a reduced ability to perform "[s]imple, [r]epetitive tasks."  (Tr. 275 ("Maintaining Attention to Perform Simple, Repetitive Tasks: MILDLY IMPAIRED. He can usually sustain concentration. Thus, he can often attend to repetitive tasks such as assembly line work").).  Specifically, Elson had a 'mildly impaired' ability to perform such tasks.  (Tr. 275).

### February 1, 2008, Dr. Meyer, Ph.D.

On February 1, 2008, Steven J. Meyer, Ph.D., a state agency psychologist, reviewed Plaintiff's medical records, completed a psychiatric review technique form, and assessed his mental residual functional capacity.  (Tr. 280-97).  Dr. Meyer stated that Plaintiff was capable of simple and some complex routine work at a reasonable pace in a setting with regular expectations, occasional intermittent interactions with others, and few changes.  (Tr. 283).  Dr. Meyer concluded that none of Plaintiff's mental impairments were severe.  (Tr. 284).

### February 5, 2008, Dr. McCloud, M.D.

On February 5, 2008, W. Jerry McCloud, M.D., a state agency physician, reviewed Plaintiff's medical records and assessed his physical functioning.  (Tr. 298-305).  Dr. McCloud limited Plaintiff to light work (Tr. 299) that did not require climbing ladders, ropes, or scaffolds.  (Tr. 300).

### March, 2008, Alice Chambly, Psy.D.

In March, 2008, Alice Chambly, Psy.D., a state agency psychologist, reviewed Plaintiff's medical records and affirmed the assessment of his mental functioning from February 2008.  (Tr. 307-09).

### April 9, 2008, Dr. Klyop, M.D.

On April 9, 2008, Gerald Klyop, M.D., a state agency physician, reviewed Plaintiff's updated medical records and affirmed the February 2008 assessment of Dr. McCloud that Plaintiff could perform light work that did not require climbing ladders, ropes, or scaffolds.  (Tr. 310).

### July 29, 2009, Dr. Padamadan, M.D.

On July 29, 2009, after the June 26, 2009 hearing in accordance with an order issued by ALJ Atkins that was responsive to an opinion, made by ME, Dr. Ruggiano, at the hearing - that Plaintiff be examined by a neuropsychologist to determine what Plaintiff could or could not do, (Tr. 34), - Dr. William Padamadan, M.D., an internist, examined Plaintiff and assessed his functioning.  (Tr. 475-88).  Dr. Padamadan found Plaintiff walked without ambulatory aides, cane, or limping, and had no clinical signs of distress.  (Tr. 476). Plaintiff demonstrated normal ranges of motion in his neck, joints, and lumbar spine, although he had some limitation of straight leg raising when supine and sitting.  (Tr. 476, 479-81).  He had no sensory or motor abnormalities, his plantar reflexes were normal, and he had normal muscle tone.  (Tr. 476).  Plaintiff's hearing, speech and sight were normal, his communication skills were normal, and he was able to sit, stand, and walk without limit. (Tr. 477).  His upper extremity functions for reaching, handling, fine movement, and gross movement were intact.  (Tr. 477-78).  He had a normal mental status, with no signs of anxiety or depression.  (Tr. 477).  Dr. Padamadan concluded that he found no indication for limitation of Plaintiff's physical activities.  (Tr. 477).

### ME Testimony

6

The Medical Expert (ME), at the June 26, 2009 was Dr. John Ruggiano, M.D., a psychiatrist certified by the American Board of Psychiatry and Neurology.  (Tr, 28).  Dr. Ruggiano stated that due to a subdural hematoma (which Plaintiff suffered in 2005), Plaintiff bled into his brain below the fibrous covering of the brain and above the brain tissue, and that this was a serious problem, as a result of which Plaintiff needed a craniotomy to surgically drain the hematoma, and there were many residual symptoms following that event. (Tr. 28-29).  Dr. Ruggiano stated that the effects of a subdural hematoma would include symptoms similar to a stroke, e.g.,  weakness, paralysis of limbs, cognitive disturbance, memory, alertness, and other effects, but that once the pressure on the brain was relieved there would often be improvement and usually a return to complete normal.  (Tr. 29).

When asked whether Plaintiff suffered any documented residual loss, the ME responded that the problem with answering that question was that there was little information.  The ME stated that there was much information from 2005, at the time of the event, but following, there was very little.  The ME also stated that there was some information in 2006 and 2007 and January, 2008 but nothing after that.  (Tr. 29-30).  The ME stated that between the consultative examinations from 2006 to 2008 there was improvement, since there were many more symptoms mentioned in the 2006 examination report (including a global function of 58 and a diagnosis of cognitive disorder),  than in the 2008 examination report. (which includes a global function of 68 and a diagnosis of personality disorder and alcohol dependence), but those reports don't include statements regarding cognitive loss.  (Tr. 30).   The ME further stated that, when referring to cognitive loss, he meant organic brain tissue disturbance, which is, he stated, not psychiatric.  (Tr. 30-31).

The ME stated that the medical record had little to say about the physical residual effects of Plaintiff's 2005 subdural hematoma.  (Tr. 30).  The ME noted that the consultative examinations were performed by Ph.D. psychologists, did not include a neurological exam and didn't offer information concerning Plaintiff's

deep tendon reflexes, or information concerning the strength and weakness of Plaintiff's limbs.  (Tr. 30).

In response to a question by the ALJ the ME  acknowledged that there was a physical examination report that stated that Plaintiff's gait on level surface is antalgic, hand function normal, dynamometric left hand grasp is weak.  (Tr. 30).

Plaintiff's attorney asked the ME whether he believed that more current testing would be necessary to get a clearer picture of Plaintiff's current situation and allow for an assessment of what Plaintiff's condition is now.  (Tr. 31-32).  The ME responded that he couldn't give an assessment, as he needed more information,  the latest he had available was the January 2008 report,  that he needed something more current, that the record  existing at the time of the hearing was consistent with Plaintiff's hearing testimony, and that a futher neurological, physical examination might be in order. (Tr. 32).  The ME stated that what is missing from his being able to offer a good opinion is a current examination and report from a neuorpsychologist. (Tr. 34).  Whereupon the ALJ stated that a post-hearing neuropsychological evaluation would be ordered. (Tr. 35-36).


**V. ALJ Findings of Fact and Conclusions of Law**

On September 18, 2009, after consideration of the entire record, and in accordance with the five step sequential analysis, ALJ Atkins made the following findings of fact and conclusions of law after the final hearing held on June 26, 2009

1. Plaintiff had not engaged in substantial gainful activity since October 1, 2007, the application date. (20 C.F.R. § 416.971 et seq.).  (Tr. 14).

2. Plaintiff has the following severe impairments: lumbar degenerative disc disease and subdural hematoma.  (20 C.F.R. § 416.920(c)).  (Tr. 14).

3. Plaintiff does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404 SubPt. P, Appx 1.  (20 C.F.R. §§ 416.920(d),

416.925 and 416.926).   (Tr. 15).

4.  Plaintiff has the residual functional capacity to perform light work involving lifting 20 pounds
    occasionally and 10 pounds frequently; involving sitting, standing and walking up to 6 hours out
    of an 8 hour day; and involving no climbing of ladders, ropes or scaffolds.  (20 C.F.R. §
    416.967(b)).  (Tr. 15-16).

5.  Plaintiff is unable to perform any past relevant work.  (20 C.F.R. § 416.965).  (Tr. 18).

6.  Plaintiff was born on May 30, 1955 and was 52 years old, which is defined as an individual
    closely     approaching advanced age, on the dated the application was filed.  (20 C.F.R. § 416.963).
    (Tr. 17).

7.  Plaintiff has at least a high school education and is able to communicate in English.  (20 C.F.R.
    § 416.963).  (Tr. 17)..  (Tr. 17).

8.  Transferability of job skills is not material to the determination of disability because using the
    Medical-Vocational Rules as a framework supports a finding that Plaintiff  is "not disabled"
        whether or not Plaintiff has transferable job skills.  (See SSR 82-41 and 20 C.F.R. Pt. 404,
    SubPt.     P, Appx. 2).  (Tr. 17).

9.  Considering Plaintiff's age, education, work experience and residual functional capacity, there are
    jobs that exist in significant numbers in the national economy that Plaintiff can perform.    (20
    C.F.R. §§ 416.969 and 416.969(a)).  (Tr. 17).

10.  Plaintiff has not been under a disability, as defined in the Social Security Act, since October 1,
    2007, the date the application was filed.  (20 C.F.R. § 416.920(g)).  (Tr. 19).

## VI. Analytical Overview: Determining Disability

District Court review of Commissioner of Social Security disability determinations is, essentially,

appellate in nature, and is limited to evaluating whether the decision made by the Commissioner is supported

by "substantial evidence" and consistent with applicable, legal standards. Colvin v. Barnhart , supra, 475

F.3d 727, 729 (6th Cir. 2007).

The "substantial evidence" component of judicial review requires that the Court determine that the

Commissioner's decision is based on "more than a scintilla of evidence but less than a preponderance; [and

that] it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

9

Cutlip v. Sec'y of Health & Human Servs, 25 F.3d 284, 286 (6th Cir. 1994).

Moreover, because district court review of the Commissioner's decision is, essentially, appellate in character, the court is not to undertake de novo review, and is restrained from attempting to resolve evidentiary conflicts as well as from making credibility determinations. Id. Rather, the reviewing court is bound to affirm the Commissioner's decision, provided that decision is supported by substantial evidence, even if the court were inclined to have decided the case differently. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999). Where supported by substantial evidence, the Commissioner's findings must be affirmed, even if there is evidence favoring plaintiff's side. Listenbee v. Sec'y of Health & Human Servs., 846 F.2d 345, 349 (6th Cir. 1988). Furthermore, the decision by the administrative law judge is not subject to reversal even where substantial evidence could have supported an opposite conclusion. Smith v. Chater, 99 F.3d 780, 781-82 (6th Cir. 1996).

DIB and SSI are properly awarded only to applicants who are determined to suffer from a "disability." Colvin, supra, 475 F.3d 727, 730 (6th Cir. 2007), (citing, 42 U.S.C. § 423(a), (d)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Colvin, supra, (475 F.3d at 729), citing, 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

In determining disability under 42 C.F.R..§§ 404.1520 and 416.920, the ALJ must undertake a five step sequential analysis:

Step 1: Determine whether applicant is engaged in "substantial gainful activity" at the time

10

benefits are being sought.  If yes,  the applicant is not disabled. If no, then move to step 2.[1]

Step 2: Determine whether the applicant suffers from any impairment which, either by itself or in combination with one or several other impairment, is "severe."  If there is no finding of a  "severe" impairment, then there is no disability.  If there is a determination that the applicant suffers a "severe" impairment, move to step 3.[2]

Step 3: Determine whether any previously identified severe impairment meets or equals a listing in the Listing of Impairments.  If yes, then the applicant is disabled.  If no, proceed to step 4.[3]

Step 4: Determine if the applicant retains sufficient "residual functional capacity"[4] to allow for

---

[1]  Substantial gainful activity is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R § 404.1572(a) and 20 C.F.R § 416.972(b). "Gainful work activity" is work that is usually done for pay or profit, whether or not profit is realized.  20 C.F.R § 404.1572(b) and 20 C.F.R § 416.972(b).  If an individual engages in substantial gainful activity that person is determined not to be disabled, regardless of the severity of any otherwise identified impairments, mental or physical.

[2]  Under the regulations, an impairment or combination of impairments is "severe"if it significantly limits the individual's ability to perform basic work activities. Impairments are "not severe" where medical and other evidence establish only slight abnormalities, individually or in combination, that have no more than a minimal, adverse effect on the individual's ability to work. .  20 C.F.R § 404.1521 and 20 C.F.R § 416.921

[3]  The previously identified severe impairment or combination of impairments must meet or medically equal an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1.  20 C.F.R §§  404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and  416.926..

[4]  A determination of the applicant's residual functional capacity must be done before the determination of whether applicant can perform past relevant work. .  20 C.F.R § 404.1520(e) and 20 C.F.R § 416.920(e).  An applicant's residual functional capacity is the ability to perform physical or mental work activities on a sustained basis even though the applicant may suffer limitations from his impairments. In making a residual functional capacity determination all the applciant's impairments, including those impairments that are not severe, must be considered. 20 C.F.R § 404.1520(e), 20 C.F.R §§ 416.920(e) and 416.945.

11

the performance of his past, relevant work.  If  the applicant possesses sufficient residual functional

capacity to perform his past relevant work, then there is no disability.   If not, move to step 5.[5]

Step 5: Determine if there are jobs in the current economy that applicant could perform, given

the limits of his residual functional capacity and consistent with the applicant's other relevant

characteristics.  If there are such jobs, then the applicant is not disabled.  If there are no such jobs, then

the applicant is disabled.[6]  See Heckler v. Campbell, 461 U.S. 458, 460, 76 L. Ed. 2d 66, 103 S. Ct. 1952

(1983), see also Combs v. Comm'r of Soc. Sec., 400 F.3d 353 (6th Cir. 2005),  Jones v. Comm'r of Soc.

Sec., 336 F.3d 469, 474 (6th Cir. 2003);  Preslar v. Sec'y of Health & Human Servs.,14 F.3d 1107, 1110

(6th Cir. 1994).  20 C.F.R. § 404.1520 (1982);.);  Tyra v. Secretary of Health and Human Services, 896

F.2d 1024, 1028-29 (6th Cir. 1990),. Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

## VII. Standard of Review

The district court shall affirm  the Commissioner's conclusions unless the Commissioner failed

to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.

McClanahan v. Comm'r of Soc.  474 F.3d 830 at 833 (citing Branham v. Gardner, 383 F.2d 614, 626-627

---

[5]  Past relevant work means work performed either as the applicant actually performed it
or as it is generally performed in the national economy either within the past 15 years or 15 years
prior to the date the disability must be established. Additionally the work must have lasted long
enough for the applicant to have learned the job and for it to have become substantial gainful
activity for him.  20 C.F.R §§ 404.1560(b) 404.1565 and 20 C.F.R §§ 416.960(b) and 945.965.

[6]  The determination of whether the applicant can do any work at all must take into
consideration the applicant's residual functional capacity along with the applicant's age,
education and work experience.  At this stage the burden is upon the Commissioner to show that
work exists in significant numbers within the economy that the applicant can do, given the
applicant's limiting characteristics.   20 C.F.R §§ 404.1512(g) 404.1560(c) and 20 C.F.R §§
416.912(g) and 945.960(c)
.

(6th Cir. 1967)).  The Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence.  Id. (citing 42 U.S.C. § 405(g )).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (citing Besaw v. Secretary of Health and Human Services, 966 F.2d 1028, 1030 (6th Cir. 1992)).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." Id. (citing Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).  Therefore, the reviewing court may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility.  Cutlip, supra 25 F.3d 284, 286 (citing Brainard v. Secretary of Health and Human Services, 889 F. 2d 679, 681 (6th Cir. 1989); Garner v. Heckler, 745 F. 2d 383, 387 (6th Cir. 1984)).

## VIII. Discussion

### Plaintiff's Issue 1: Whether substantial evidence supports the ALJ's finding that Plaintiff did not have a medically determinable psychiatric impairment?

Plaintiff argues that the ALJ failed to recognize that Plaintiff had the medically determinable mental impairment:  personality disorder and that the ALJ's failure to incorporate this condition into his disability evaluation constituted harmful error.  (Plaintiff's Brief on the Merits, Docket No. 12, 5).  In support, Plaintiff avers that Agency examining psychologist Dr. Layne, based on his clinical examination of Plaintiff, diagnosed Plaintiff with personality disorder.  (Id.).  See 20 § C.F.R. § 416.928(b) (psychiatric signs must be shown by observable facts).

13

In support of his argument and by way of contrast, Plaintiff notes that the ALJ's decision referred to Dr. Layne's January 17, 2008 examination of Plaintiff, and, in reference thereto, the ALJ noted Dr. Layne had concluded that Plaintiff exhibited no signs of anxiety nor had any complaints of anxiety (Exhibit 4F, 22F) (Tr. 15) (Tr. 273). Plaintiff also noted that the ALJ also remarked that there was no indication that Plaintiff had ever been treated for anxiety with either counseling or medication. (Plaintiff's Brief in the Merits, Docket No. 12, 6)  (Tr. 15).  Plaintiff proceeds to argue that "[j]ust because Elson did not have anxiety as a medically determinable  mental impairment does not mean that he did not have a personality disorder as such an impairment"  (Plaintiff's Brief in the Merits, Docket No. 12, 6).

Accordingly, Plaintiff states that the ALJ was required to consider Plaintiff's alleged personality disorder in making a disability determination.  Plaintiff asserts that the ALJ's decision is flawed because it failed to incorporate this diagnosis (i.e., personality disorder) in its analysis. See 20 C.F.R. § 416.927(d) and SSR 96-5p (requiring the evaluation of an examining psychologist's report); see also Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010) (administrative decision that fails to mention "highly pertinent evidence" will not be upheld); Universal Camera Corp. v. NLRB, 340 U.S., 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight").

Notwithstanding Plaintiff's assertions, his argument is lacking a crucial factual predicate. Plaintiff states "In January 2008, Agency psychologist Dr. Layne diagnosed a personality disorder based on his clinical examination."  (Plaintiff's Brief in the Merits, Docket No. 12, 6).  (Emphasis added). However, a close review of Dr. Layne's January 17, 2008, "A Disability Assessment Report on Mr. Richard Elson" does not bear out this claim.  Specifically, Dr. Layne wrote on page 5 of that report in

14

the section entitled Summary, Conclusions: "Recently a professional has found him to have a normal IQ but has noted subtle memory problems.  That professional diagnosed a cognitive disorder, alcoholism and a personality disorder.  Today, Mr. Elson showed these problems."  (Tr. 275)[7]

Thus, the record does not show, as Plaintiff contends, that Dr. Layne <u>diagnosed</u> Plaintiff with "personality disorder."  Rather, Dr. Layne's January 17, 2008 report only <u>referred</u> to personality disorder, stating  that "another professional" had diagnosed Plaintiff with a personality disorder, and that Plaintiff exhibited said problem on the day he was evaluated by Dr. Layne.

Plaintiff might object that drawing a distinction between referring to a condition diagnosed by another and actually diagnosing a condition is unduly hyper-technical.  However,  Dr. Layne's report is replete with specifically articulated diagnoses, <u>see</u> Tr. 272-76, but personality disorder is not among them.  This Court is confident that had Dr. Layne concluded that Plaintiff had a personality disorder he would have expressly, affirmatively and unambiguously articulated same in his report.   However, Plaintiff's contention to the contrary, Dr. Layne did not do this, therefore Plaintiff's first claim of error is lacking a necessary, factual predicate.

Whatever the merits in the abstract of Plaintiff's point of error No. 1, this Court  is not compelled to reach further into this issue.

Accordingly, this Court rejects Plaintiff's claim of error as set forth in Plaintiff's Issue No. 1 and finds that substantial evidence supports the ALJ's finding that Plaintiff did not have a medically determinable psychiatric impairment.

_____

[7] Contrast, Dr. Layne's <u>own</u> <u>diagnostic</u> conclusions regarding five different categories of work-related mental abilities, wherein Dr. Layne opined that Plaintiff was either mildly impaired or not impaired with respect to four of them and found Plaintiff impaired only as to the category of managing money.. (Tr. 275-76)

**Plaintiff's Issue 2: Whether substantial evidence supports the ALJ's evaluation of non examining State-agency psychologist Dr. Meyer's February, 2008 opinions?**

Plaintiff asserts that the ALJ erroneously evaluated the opinions of Dr. Meyer, a non-examining State-agency psychologist, concerning Plaintiff's mental functional limitations and mental residual functional capacity.  Plaintiff asserts that despite having accorded "significant weight" to Dr. Meyer's opinions, the ALJ's RFC determination failed to incorporate properly Dr. Meyer's opinions.  (Plaintiff's Brief on the Merits, Docket No. 12, 8).

Plaintiff asserts that the ALJ erred regarding Dr. Meyer's opinions, stating that such opinions mandated review by a vocational expert at step five of the sequential disability analysis and that the ALJ did not have these opinions evaluated by a vocational expert.  (Plaintiff's Brief on the Merits, Docket No. 12, 8-9).

Dr. Meyer opined that Plaintiff was capable of "simple and some complex routine work, that [he] is motivated to perform, at reasonable pace, in setting; with regular expectations, occasional intermittent interactions with others and few changes."  (Tr. 283).

As previously noted the ALJ concluded that Plaintiff had "the residual functional capacity to perform light work involving lifting twenty pounds occasionally and ten pounds frequently; involving sitting, standing and walking up to six hours out  of an eight hour day; and involving no climbing of ladders, ropes, scaffolds.  (20 C.F.R. § 416.967(b))."  (Tr. 15-16).  The ALJ also noted that Plaintiff's past relevant work was unskilled.  (Tr. 18).

Plaintiff argues that the ALJ cited no authority for the proposition "that 'unskilled' work is coextensive with work that involves only 'occasional intermittent interactions with others and few changes' or that such limitations do not significantly diminish a claimant's ability to perform 'unskilled'

16

work" (Plaintiff's Brief on the Merits, Docket No. 12, 9).

Plaintiff is correct in observing that in his decision ALJ Atkins did not expressly and specifically mention or refer to Dr. Meyer. However the ALJ did indicate, albeit generally, that he did take Dr. Meyer's opinions into consideration when reaching his residual functional capacity determination, stating:

> In accordance with Social Security Ruling 96-6p, the undersigned has carefully considered the State agency medical opinions of the nonexamining physicians. The residual functional capacity conclusions reached by these physicians support a finding of 'not disabled.' Although those physicians were non-examining, they are accorded significant weight, particularly in the instant case, where there exists consistent medical evidence to reach similar conclusions (as explained throughout this decision) and where their opinions are not contradicted.

(Tr. 17). (emphasis added).

On this basis, and consistent with the previous steps of the five step sequential analysis, the ALJ concluded that Plaintiff was unable to perform his past relevant work. 20 C.F.R. § 416.965.[8] (Tr. 18).

The ALJ then found jobs existed in significant number in the national economy that Plaintiff could perform. (Tr. 18). In reaching this determination the ALJ considered Plaintiff's RFC, age, education and work experience in conjunction with Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, Appx. 2. (Tr. 18). The ALJ also noted that special consideration was given to Security Rulings 83-14 and 96-4p which provide guidance when nonexertional limitations co-exist with exertional limitations. Accordingly, the ALJ noted that "[w]hile these additional limitations preclude the performance of [the] full range of light exertional work, the limitations virtually leaves [sic] the light occupational base intact. The undersigned Administrative Law Judge finds the mere inability to perform

---

[8] It is noteworthy that Plaintiff did not dispute this finding despite the ALJ having made it without having consulted a Vocational Expert.

substantially all light occupations does not equate to a finding of disability. . ." (Tr. 19). The ALJ stated

that he took "administrative notice" that various authoritative publications identify occupations that exist

in the national economy and that such jobs do not require special skills or experience. (Tr. 19) (referring

to 20 C.F.R. § 416. 966, SSR 83-10, SSR 96-9p, fn5, 20 C.F.R. Pt. 404, Subpt. P, Appx 2 202.00(a)).

Plaintiff argues such a determination, as referred to in the preceding paragraph was in error

because it required consultation with and testimony by a vocational expert, citing, Abbott v. Sullivan,

905 F.2d 918, 926 (6th Cir. 1990), in support. Plaintiff refers this Court to Abbot stating that Abbot

provides a "test for determining when vocational-expert testimony is required." (Plaintiff's Brief on the

Merits, Docket No. 12, 9).

Abbott does not, as Plaintiff contends, provide such a test.[9]

Abbott does, however, provide guidance on the issue of whether the ALJ applied the Grids

properly.

> The Secretary employs the Medical-Vocational Guidelines, also referred to as the "grid," in the
> fifth and final stage of the disability determination, after it has been determined that the claimant
> has not met the requirements of a listed impairment but is nevertheless incapable of performing
> past relevant work. At this point, the Secretary bears the burden of demonstrating that,
> notwithstanding the claimant's impairment, he retains the residual functional capacity to perform
> specific jobs existing in the national economy.

Abbott, supra, 905 F.2d at 926, citing Cole v. Secretary of Health & Human Services, 820 F.2d 768, 771

(6th Cir. 1987); Richardson v. Secretary of Health & Human Services, 735 F.2d 962, 964 (6th Cir. 1984).

> Where the claimant suffers from an impairment limiting only his strength, the Secretary can
> satisfy his burden, without considering direct evidence of the availability of jobs the particular
> claimant can perform, through reference to the grid. The grid aids the Secretary in determining
> disability claims by allowing "administrative notice" to be taken of the existence of jobs in the
> national economy that those with particular combinations of the four statutory factors are capable

---

[9] It should be noted that a vocational expert testified at the hearing in Abbot, supra.

of performing.

Id., citing, Kirk v. Secretary of Health & Human Services, 667 F.2d 524, 529 (6th Cir. 1981), cert.

denied, 461 U.S. 957, 77 L. Ed. 2d 1315, 103 S. Ct. 2428 (1983).

> The grid is composed of rules, numbered 200.02 through 203.31, each of which specifies whether a claimant with a particular combination of the four factors listed in the Act, 42 U.S.C. §§ 423(d)(2)(B) and 1382c(a)(3)(B), will be found disabled or not disabled..

Id.

> The Medical-Vocational Guidelines take account only of a claimant's "exertional" impairment; that is, "an impairment which manifests itself by limitations in meeting the strength requirements of jobs[.]" 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). Where a claimant suffers from an impairment that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness, . . . manipulative restrictions, . . . or heightened sensitivity to environmental contaminants, . . . rote application of the grid is inappropriate. . . .  In the case of an individual who suffers from both exertional and nonexertional impairments, where the grid does not yield a finding of "disabled" when the exertional  impairments are considered alone, the grid may be employed only as a "framework" to provide guidance. See 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e)(2).

Id. (citations omitted).

Review of the ALJ's analysis that which is provided after points 6 (age), 7 (education), 8 (work) and 9 (RFC) in his decision shows that the ALJ properly applied the Grids as a framework, including taking "[c]areful consideration" of exertional and nonexertional impairments.  (Tr. 18-19).

Plaintiff argues that the ALJ "cited no evidence or authority that 'unskilled' work is coextensive with work that involves only 'occasional intermittent interactions with others and few changes,'" insinuating that such limitations significantly diminish Plaintiff's ability to perform work.  However Plaintiff takes this reference to such a "limitation" out of context.  The addition of the word "only" in Plaintiff's narrative is misleading.  Rather, read in context, Dr. Meyer opined that Plaintiff was capable of "simple and some complex routine work, that [he] is motivated to perform, at reasonable pace, in

setting; with regular expectations, occasional intermittent interactions with others and few changes." (Tr. 283). Read correctly, Dr. Meyers was making the affirmative point that Plaintiff possessed the capability of occasional, interactions with others.

More importantly, if emphasis on such nuance of language is too technical by half and unpersuasive, Plaintiff offers no independent argument that the Dr. Meyers' opinion that Plaintiff was capable of "'only' occasional intermittent interactions with others and few changes" constituted an impairment that significantly diminished Plaintiff's capacity to work, such as would require either a more detailed explanation by the ALJ or, in the alternative, the testimony of a VE.

Accordingly, this Court rejects Plaintiff's claim of error as set forth in Plaintiff's Issue No. 2 and finds that substantial evidence supports the ALJ's evaluation of non examining State-agency psychologist Dr. Meyer's February 2008 opinions.

> **Plaintiff's Issue 3: Whether substantial evidence supports the ALJ's evaluation of examining State-agency psychologist Dr. Layne's February, 2008 opinions?**

Plaintiff states that the ALJ erred by giving no reason for "implicitly rejecting examining psychologist Dr. Layne's January 2008 opinions [as being] more restrictive than the ALJ's residual functional capacity assessment." (Plaintiff's Brief on the Merits, Docket No. 12, 10).

Plaintiff argues that, pursuant to 20 C.F.R. § 416.927(d) and SSR 96-5p, an ALJ must evaluate opinions not only from a claimant's treating source but from other sources as well. "Regardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 416.927(d). Similarly, SSR 96-5p.

Plaintiff argues that the ALJ erred because Dr. Layne opined that Plaintiff was "more limited than the ALJ recognized:" and that the the ALJ found that Plaintiff could perform the demands of unskilled

work, including the "mental" demands of such work only "because the ALJ did not include <u>any</u> mental

limitation in his residual functional capacity assessment" (Plaintiff's Brief on the Merits, Docket No. 12,

11). (emphasis original).  To exemplify the significance of what Plaintiff argues is the ALJ's disregarding

of the mental impairment component of his RFC assessment, Plaintiff states that the ALJ ignored that

"Dr. Layne opined that Elson had a <u>reduced</u> ability to perform 's]imple [r]epetitive tasks'" (Plaintiff's

Brief on the Merits, Docket No. 12, 11).  (emphasis original).

Set forth below is the applicable portion of Dr. Layne's January 17, 2008 Report:

Discussion of 5 Work-related Mental Abilities

Understanding, Following Instructions: Mildly Impaired.  He can usually understand the environment.  His ability to understand and follow instructions is adequate when they are oral and adequate when written.  He filled out our form today, for example.

Maintaining Attention to Perform Simple, Repetitive Tasks: Mildly Impaired. <u>He can usually sustain concentration. Thus he can often attend to repetitive tasks</u> such as assembly line work.

Relating to Others, Including Coworkers: Not Impaired. Mr. Elson can relate to bosses and coworkers.  He does have the intellect and social skills.  He does have the emotional stabilty to relate to others.

Withstanding Day-to-Day Work Stress: Not Impaired.  He can withstand the stress and pressures associated with day-to-day work.  Emotionally, he can endure full workdays and work-weeks.

Managing Money: Impaired.  He does moderately possess sufficient intelligence and mathematical ability to handle money and count change.  He does not have the judgement and motivation to spend money wisely.  He continues to drink.

(Tr. 275-76).  (emphasis added).

Plaintiff's contentions to the contrary, a closer reading of Dr. Layne's January 17, 2008 report

does not show that Dr. Layne opined that Plaintiff "had a reduced ability to perform '[s]imple,[r]epetive

tasks'" Rather, Dr. Layne's opinion is that Plaintiff was mildly impaired in the category of maintaining attention to perform simple, repetitive tasks, but could usually sustain concentration and was often able to attend to repetitive tasks.

Moreover, Plaintiff argues that the ALJ did not include any mental limitation in his RFC analysis. This, however is not the case.  As previously noted in this Court's discussion of Issue No. 2, above, the ALJ did indicate, albeit generally, that he did take Dr. Layne's opinions into consideration when reaching his residual functional capacity determination, stating:

> In accordance with Social Security Ruling 96-6p, the undersigned has carefully considered the State agency medical opinions of the nonexamining physicians. The residual functional capacity conclusions reached by these physicians support a finding of 'not disabled.' Although those physicians were non-examining, they are accorded significant weight, particularly in the instant case, where there exists consistent medical evidence to reach similar conclusions (as explained throughout this decision) and where their opinions are not contradicted.

(Tr. 17). (emphasis added).

Accordingly, this Court rejects Plaintiff's claim of error as set forth in Plaintiff's Issue No. 3, and finds that substantial evidence supports the ALJ's evaluation of  examining State-agency psychologist Dr. Layne's February 2008 opinions.

**Plaintiff's Issue 4: Whether substantial evidence supports the ALJ's evaluation of medical expert Dr. Ruggiano's June, 2009 testimony?**

Regarding Issue No. 4, Plaintiff states that:

(a)   the ALJ erred by stating that Dr. Ruggiano opined that Plaintiff neither met nor equaled a listed impairment at step three of the five step sequential analysis where Dr. Ruggiano offered no opinion regarding step 3.  (Plaintiff's Brief on the Merits, Docket No.

(b)   the ALJ  erred by implicitly rejecting Dr. Ruggiano's opinion (which was stated at the hearing) that Plaintiff should be evaluated by a neuropsychologist when the ALJ

22

incorporated into the record a report of a post-hearing consultative examination of Plaintiff by an <u>internist</u>,. (<u>Id</u>.); and

(c)     the ALJ erred by failing "to grapple with" a portion of Dr. Ruggiano's testimony that was consistent with certain testimony Plaintiff had offered earlier in the hearing about his condition.  (Plaintiff's Brief on the Merits, Docket No. 12, 14).

**Issue 4(a)**.     At step three of the five step sequential analysis, ALJ Atkins determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, Appx. 1.  (Tr. 15).  In support of this determination the ALJ wrote:

> John Ruggiano, MD, the medical expert who testified at the hearing reviewed the medical evidence and determined that none of the claimant's impairments, either singly or in combination, medically meet or equal the criteria of any listed impairments during the requested period. (Hearing testimony)

(Tr. 15).

Review of Dr. Ruggiano's June 26, 2009  hearing testimony (Tr. 28-32, 34-35) reveals no such statement by Dr. Ruggiano.

Neither is there any statement supplementing Dr. Ruggiano's hearing testimony in the record as a whole.  (E.g., there is no statement in the record wherein Dr. Ruggiano offers his opinion in light of the July 29, 2009 report of the post-hearing consultative examination of Plaintiff by Dr. William D. Padamadan, M.D. (Tr. 475-88).)

It is, ultimately, the responsibility of the ALJ and not the hearing medical expert to make the step three determination, 20 C.F.R.§§ 416.920(d), 416.925 and 416.926.  In his report the ALJ stated that he based his determination that Plaintiff did not meet the Listed Impairment requirement on several factors:

no treating or examining physician had indicated that Plaintiff had a condition that met the Listings, the requirements of Listing 11.04 (central nervous system vascular accident) were not met; the requirements of Listing 1.04 (disorders of the spine) have not been met, and the ALJ's  assertion that Dr. Ruggiano stated that Plaintiff had no condition that met the Listings.  Moreover, at the June 26, 2009 hearing the ALJ stated, "To help me understand some ot the medical aspects of your case I have asked a smedical expert, Dr. Ruggiano to be here"  (Tr. 23).

Accordingly, while it is possible that the ALJ based his determination that Plaintiff did not meet a Listed Impairment on substantial evidence even in the absence of Dr. Ruggiano's opinion.  However, because the ALJ expressly asserted that his Listed Impairment determination was based on several factors, including a statement attributed to Dr. Ruggiano, which statement is nowhere to be found in the record, this Court must find that the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P., Appx. 1 was not based on substantial evidence.

**Issue 4(b)**.    At the June 26, 2009 hearing, in response to questioning by the ALJ and followup questioning by Plaintiff's counsel regarding the nature and extent of Plaintiff's improvement from the subdural hematoma he suffered in 2005, Dr. Ruggiano stated that he needed information, in particular a more current assessment of Plaintiff's condition, specifically, a physical/neurological examination before he would be able to provide an assessment of Plaintiff. (Tr.28-32).  Later in the hearing, Dr. Ruggiano suggested that a neuropsychologist would be able to provide the kind of examination that would enable  him (Dr. Ruggiano) to make an adequate assessment of Plaintiff's current condition.

Subsequently, a post-hearing internal medicine evaluation consultative examination of Plaintiff was performed by Dr. William D. Padamadan, M.D., an internist.  On July 29, 2009, Dr. Padamadan

24

issued a report of describing the procedures and findings of his consultative examination.  (Tr. 475-88).

Plaintiff asserts that - because Dr. Ruggiano suggested at the hearing that the post-hearing consultative examination be performed by a neuropsychologist (Tr. 34) but the actual post-hearing consultative examination was performed by an internist (Dr. Padanadan) - the post-hearing examination is somehow inadequate or invalid because "the ALJ failed to grapple with Dr. Ruggiano's specification that a neuropsychological examination was preferred."  (Plaintiff's Brief on the Merits, Docket No. 12, 13).

Plaintiff seems to miss the point of the of the type of examination Dr. Ruggiano requested.  While there is no question that Dr. Ruggiano suggested that the post-hearing consultative examination be performed by a neuropsychologist, (Tr. 34), the real issue in this regard is (i) what additional information was Dr. Ruggiano seeking that he believed would enable him to complete his assessment of Plaintiff and (ii) whether the internal medicine examination of Plaintiff  by internist Dr. Padamadan would achieve this objective.

A closer reading of the colloquy between the ALJ and Dr. Ruggiano regarding clearly establishes that Dr. Ruggiano found that the Plaintiff's medical record was lacking a current assessment of Plaintiff's physical/neurological condition.

> Q.  So that's cognitive.  But let's talk about physical then?
>
> A.  Oh, well, what i mean – I should clear that up.  When I say cognitive loss that means organic brain tissue disturbance.  That's not psychiatric.  It's not like as you would see with schizophrenia or depression, or so on.
> . . .
>
> Q.  So you say the effects of this could be like a stroke?
>
> A.  Correct.

25

Q.  And a lot of times we see the physical effects of a stroke effect the ability to move, and      strength, and that sort of thing?

A.  That's correct.

Q.  Okay.  So here how about the physical residuals of this?

A.  Again, I have to say there is very little.  These consultative exams were both done by Ph. D's.  It didn't include a neurologic exam, and i don't see what the deep tendon reflexes are.  I don't see what the strength and weaknesses of the linbs are.  Their consultative exam is done by psychologists.

Q.  (by Plaintiff's counsel) Doctor, do you feel that more current testing would be necessary to get a clearer picture of the claimant's current situation, or can you give an assessment as to what is to likely be at the present time?

A..  No.  I can't give an assessment. . . .

. . .

ATTY.  All right.  I have no other questions of the doctor, Your Honor.  It may be that a          further neurological - -

ALJ.  Well, just a minute.

ATTY.  Physical examination might be in order.

(Tr. 30-32).

The ALJ then followed up.

Q.  Now getting back to you, doctor.  What is missing, in your opinion, from being able to form a good opinion here?

A.  A recent assessment of what he can do and can't do.

Q.  By whom?

A.  Well, a neuropsych would be good.

(Tr. 34).

26

It is clear from the context of the above discussion that Dr. Ruggiano was interested in an examination that would assess certain neurophysiological and neuromuscular facets of Plaintiff's overall physical condition., e.g., deep tendon reflexes, strength and weakness of limbs, etc.

A cursory view of Dr. Padamadan's internal medicine evaluation - which included manual muscle testing and range of motion assessment and an ability to do work-related physical activities assessment, (Tr. 476-87) -  shows that the doctor's examination included assessments of just those factors Dr. Ruggiano had indicated were absent at the time of the hearing but necessary for him to make a proper evaluation of Plaintiff.

Plaintiff's claim of error concerning the post-hearing consultative examination by internist Dr. Padamadan is, therefore, denied.

**Issue 4(c).**  Plaintiff argues that the ALJ erred by failing "to grapple with" a portion of Dr. Ruggiano's testimony that was consistent with certain testimony Plaintiff had offered earlier in the hearing about his condition.  (Plaintiff's Brief on the Merits, Docket No. 12, 14).

As to this claim of error Plaintiff is referring to the following Q and A between Plaintiff's counsel and Dr. Ruggiano.

> Q.  Doctor, do you feel that more current testing would be necessary to get a clearer picture of the claimant's current situation, or can you give an assessment as to what it is to likely be at the present time?

> A.  No. I can't give an assessment.  I need more information. The latest I have is January of '08, and that is a year-an-a-half ago.  So I need something more current.

> Q.  As far as the record as it exists now, is it consistent with the testimony that the claimant has given so far?

> A.  Yes.

(Tr. 31-32).

27

Plaintiff extrapolates from the above referenced remark by Dr. Ruggiano that Dr. Ruggiano would have concurred, without reservation, with the following statement made by Plaintiff at the hearing: "I don't have any balance in my left leg. My left arm is weak, and I'm left handed.  My back goes out now. I could be sitting there, and my back will go out without hardly ever moving."  (Tr. 28)   On this basis Plaintiff argues that the ALJ's step 5 analysis required the testimony of a vocational expert.

This Court finds Plaintiff's effort to extrapolate the conclusion from Dr. Ruggiano's answer to the very general question posed to him by Plaintiff's counsel at the hearing  that Dr. Ruggiano would have agreed with the particulars of Plaintiff's  self-diagnostic assessment seems unduly speculative and overreaching.  Had Plaintiff's counsel at trial reiterated, in his questioning of Dr. Ruggian, those particular portions of Plaintiff's hearing testimony he was interested in hearing Dr. Ruggiano opine about, this Courts assessment of this claim of error (Issue 4(c)) might be different.  However, Plaintiff's counsel did not pursue this line of questioning with Dr. Ruggiano.  Accordingly, this Court sees little value in the argument Plaintiff raises herein.

The Court also rejects Plaintiff's contention for the reasons discussed above and for reasons similar to those on which basis it rejected Plaintiff's arguments calling for vocational expert in it's discussion of Plaintiff's Issues No. 2 and No. 3., above.

Therefore, as to the matters raised in Plaintiff's Issue No. 4, this Court rejects Plaintiff's claim of error as set forth in Plaintiff's Issue No. 4(b) and 4(c) and finds that substantial evidence supports the ALJ's evaluation of medical expert Dr. Ruggiano's June, 2009 testimony as to these issues.

However, as to the claim of error set forth in Plaintiff's Issue No. 4(a), the Court finds the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P., Appx. 1 was not based

28

on substantial evidence, and orders that the case be remanded to the Commissioner for the limited purpose of allowing Dr. Ruggiano the opportunity to review the post-hearing report of Dr. Padamanan and offer an opinion thereof in a manner deemed appropriate by the Commissioner.

**Plaintiff's Issue 5: Whether the ALJ erroneously failed to evaluate Plaintiff's condition prior to his October 1, 2007 application date**.

Plaintiff states that even though his SSI application was filed on October 1, 2007, the ALJ's adjudication of his SSI case from the date of that application was in error because Plaintiff could establish entitlement to benefits by virtue of being disabled for a continuous twelve month period prior to and including November. 2007. (Plaintiff's Brief on the Merits, Docket No. 12, 15). Plaintiff also argues that, because his October 1, 2007 SSI application alleged an onset date of April 12, 2006, (Id.), the application asserted an "implied request to reopen the prior final and binding determination (denial) of his application filed in 2006." (Id.). (emphasis original). Plaintiff argues that the ALJ failed to rule on his implied request to reopen Plaintiff's 2006 application. Plaintiff also states that this Court should reject any argument that res judicata somehow bars the Court considering Plaintiff's pre-.October, 2007 condition. (Plaintiff's Brief on the Merits, Docket No. 12, 16)

As Defendant argues, the relevant time period for consideration in a supplemental security income case begins the month Plaintiff filed for supplemental security income, not his alleged disability onset date. See 20 C.F.R. §§ 416.330, 416.335 (since a supplemental security income claimant is not entitled to supplemental security income benefits prior to the date that the claimant files a supplemental security income application, the relevant time frame for consideration in a supplemental security income case begins with the month the claimant filed his or her application). Thus, the ALJ considered the proper time period in this case, from October 1, 2007, the date of Plaintiff's application, to September 18, 2009, the

29

date of the ALJ's decision.

In support of his argument that his October 1 2007 SSI application should be read by this Court as an implied request to reopen a prior filing, Plaintiff refers this Court to POMS § DI 27501.005(B)(1). POMS § DI 27501.005 provides, generally, for reopening and revising a determination or decision. POMS § DI 27501.005(B)(1) sets forth the conditions upon which a reopening of an application may arise

Consider a reopening when:

a. A party to the determination or decision requests (or impliedly requests) reopening by:

- writing SSA or the DDS

- writing a third party (e.g., a congressman), or

- filing a new claim (e.g., a denied claiming files a subsequent claim and alleges an onset of disability in the period adjudicated by the prior denial determination    or decision).

POMS § DI 27501.005(B)(2) discusses the <u>requirements</u> a claimant shall meet before a determination or decision may be reopened.  These include, (a) the prior disability decision being determined with finality (<u>see</u>, POM § 27501.001A.3); (b) a reason to reopen (e.g., new and material evidence); (c) a timely written statement by the party indicating disagreement with the prior decision; and (d) a timely written statement by an authorized component of SSA or DDS that questions the correctness of the prior decision.

In the present case,  Plaintiff has not met all of the requirements discussed above.  Moreover, Plaintiff has not satisfied the necessary procedural steps set forth in POMS § DI 27501.005(D)(2) (Necessary Steps When Reopening and Revising a Determination) for reopening the prior determination to which  he refers.

30

Accordingly, this Court rejects Plaintiff's claim of error as set forth in Plaintiff's Issue No. 5 and finds that the ALJ's did not erroneously fail to evaluate Plaintiff's condition prior to his October 1, 2007 application date.

**Plaintiff's Issue 6: Whether substantial evidence supports the ALJ's evaluation of treating physician Dr. Rizk's October, 2005 opinion?**

Plaintiff states that the ALJ erred by failing to articulate with required specificity his rationale for according the opinion of Plaintiff's October 2005 treating physician Dr.Tallat Rizk such significance as the ALJ accorded to it    (Plaintiff's Brief on the Merits, Docket No. 12, 16)

The record establishes that Dr. Tallat Rizk, who identified himself as an attending physician, prepared a discharge summary arising out of Plaintiff's August 24 2005 through September 7, 2005 hospitalization related to Plaintiff's July 31, 2005, left subdural hematoma.  (Tr. 314 -16).

The record also contains a mental functional capacity assessment report of Plaintiff signed by Dr. Rizk, assessment dated October 6, 2005.  (Tr. 312-13, 319-20 (the two citations appear to be identical copies)).  The report identifies twenty separate mental functions (e.g., ability to remember, ability to carry out detailed instructions, ability to ask simple questions, etc.) that the completing physician, Dr. Rizk, determined to be either moderately limited or markedly limited.  (Tr. 312-13, 319-20).

Of note, the second page of Dr. Rizk's report states, in response to the question, "[h]ow long are the physical and/or mental functional limitations listed above expected to last?" "Between 9 months and 11 months."  (Tr. 312-13, 319-20).

As an attending physician, Dr. Rizk was a "treating physician" as contemplated under the regulations.  20 C.F.R. § 416.927.  See, Hensley v. Astrue, 573 F.3d 263, 266-67 (6th Cir. 2009).  As such, the ALJ was required to assess Dr. Rizk's opinions in accordance with the treating physician rule.

31

The treating physician rule provides that greater weight is usually accorded treating physician opinions.  20 C.F.R. § 416.927(d)(2).  Moreover, even where the ALJ ultimately determines that a treating physician's opinions is not to be accorded controlling weight the ALJ is required to explain with specificity his rationale for rejecting the treating physician's opinion.

Where appropriate conditions are met, a treating physician's opinions are accorded "substantial, if not controlling deference."  <u>Vance v. SSA</u>, 260 F. App'x 801, 804 (6th Cir. 2008), <u>Warner v. SSA</u>, 375 F.3d 387, 390 (6th Cir. 2004).

Where evidence does not warrant a treating physician's opinions being given controlling weight, treating physician opinions must nonetheless be evaluated in accordance with the criteria set forth in 20 C.F.R. § 404.1527(d)(2)(i) and (ii) which list such factors as duration of physician patient treatment relations.  Where a treating physician opinion is <u>not</u> given controlling weight the Commissioner shall "give good reasons in [the] notice of determination or decision for the weight" accorded to such opinion. 20 C.F.R. § 404.1527(d)(2).  <u>See</u>, <u>Wilson v. Comm'r of Social Security</u>, 378 F.3d 541, 544 (6th Cir. 2004).

In his decisions the Commissioner must articulate his reasons for the weight given an applicant's treating source's opinions.  <u>Id</u>.  When denying benefits the Commissioners decisions shall

> contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

<u>Id</u>., <u>citing</u>. Social Security Ruling 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188, at *5.  <u>See</u>, <u>also</u>, <u>Rogers v. Commissioner of Social Security</u>, 486 F.3d 234, 242 (6th Cir. 2007).

It is apparent to this Court why the ALJ would have discounted Dr. Rizk's opinion when making

his disability determination.  Dr. Rizk's mental functional capacity assessment was prepared on October 6, 2006, only  two months after the Plaintiff suffered his subdural hematoma, six weeks after a second surgery to replace a bone flap and one month after discharge from another hospitalization subsequent to Plaintiff's second surgery, and in that assessment Dr. Rizk opined that the various mental limitations he had identified would resolve between nine to eleven months.  (Tr. 314-16, 319-20).  The Court notes that Dr. Rizk's opinion that the mental limitations that he observed in Plaintiff would resolve between nine and eleven months is actually supportive of the ALJ's determination.

However, despite the fact that the Court regards the ALJ's failure to explain with specificity his rationale for discounting treating physician Dr. Rizk's opinion as harmless error, this Court is compelled to find that the ALJ failed to comply with the requirements of the treating physician rule with respect to Dr. Rizk's opinions.

Accordingly, the Court finds that substantial evidence does not support the ALJ's residual functional capacity assessment, adverse credibility finding, or step-five decision only as to the limited issue of the ALJ failing to articulate with specificity his rationale for discounting treating physician Dr. Rizk's October 2005 opinions.  Therefore, it is ordered that  this case is remanded to the Commissioner for the limited purpose of having the ALJ specifically articulate his assessment of the October, 2005 opinion of Plaintiff's treating physician. Dr. Tallat Rizk and what effect, if any, it may have on the ALJ's determination of Plaintiff's disability.

**Plaintiff's Issue 7: Whether substantial evidence supports the ALJ's evaluation non-examining State-agency psychologist Dr. Wagner's December, 2006 opinions?**

Plaintiff states that the ALJ erroneously evaluated non-examining State-agency psychologist Dr. Wagner's opinions about Plaintiff's functional limitations.   Plaintiff states that the ALJ erroneously

evaluated Dr. Wagner's opinions just as he erroneously evaluated Dr. Meyer's opinions. (Plaintiff's Brief on the Merits, Docket No. 12, 19).

This Court previously addressed Plaintiff's claim of error regarding Dr. Meyer in its analysis of Plaintiff's Issue No. 2, above, rejecting Plaintiff's claim of error and concluding that there was was substantial evidence to support the ALJ's evaluation of Dr. Meyer's opinion.

Since Plaintiff asserts that the ALJ erroneously evaluated Dr. Wagner's opinions just as he erroneously evaluated Dr. Meyer's opinions and this Court has determined that the ALJ did <u>not</u> erroneously evaluate Dr. Meyer's opinions it only follows that the Court concludes that the ALJ did not erroneously evaluate Dr. Wagner's opinions.

Accordingly, this Court rejects Plaintiff's claim of error as set forth in Plaintiff's Issue No. 7 and finds that substantial evidence supports the ALJ's evaluation of non examining State-agency psychologist Dr. Wagner's December, 2008 opinions.

## IX. CONCLUSION

For these reasons, the Magistrate recommends that the the decision of the ALJ in this case be Affirmed in part and Reversed and Remanded in part. Specifically, the Court finds that, as to:

**Plaintiff's Claim of Error No. 1:**

The Court finds that substantial evidence supports the ALJ's finding that Plaintiff did not have a medically determinable psychiatric impairment, and, as to Plaintiff's Claim of Error No. 1., the decision of the Commissioner is affirmed.

**Plaintiff's Claim of Error No. 2:**

The Court finds that substantial evidence supports the ALJ's evaluation of non-examining State-agency psychologist Dr. Meyer's February, 2008 opinions, and, as to Plaintiff's Claim of Error No. 2, the decision of the Commissioner is affirmed.

**Plaintiff's Claim of Error No. 3:**

The Court finds that substantial evidence supports the ALJ's evaluation of examining State-agency psychologist Dr. Layne's February, 2008 opinions, and, as to Plaintiff's Claim of Error No. 3, the decision of the Commissioner is affirmed.

**Plaintiff's Claim of Error No. 4:**

### Plaintiff's Claim of Error No 4(b):

The Court finds the ALJ did not err by incorporating into the record the report of the post-hearing consultative examination of Plaintiff by Dr. Padamadan, an internist, despite the suggestion at the hearing and finds that substantial evidence supports the ALJ's evaluation of medical expert Dr. Ruggiano's June, 2009 testimony in this regard, and, as to this component (b) of Plaintiff's Claim of Error No. 4, the decision of the Commissioner is affirmed.

### Plaintiff's Claim of Error No. 4(c):

The Court finds that the ALJ did not err in the manner in which he addressed and evaluated certain portions of ME Dr. Ruggiano's hearing testimony as it may have related to earlier hearing testimony offered by Plaintiff concerning Plaintiff's medical condition and finds that substantial evidence supports the ALJ's evaluation of medical expert Dr. Ruggiano's June, 2009 testimony in this regard, and, as to this component (c) of Plaintiff's Claim of Error No. 4, the decision of the Commissioner is affirmed.

### Plaintiff's Claim of Error No. 4(a):

The Court finds that ALJ erred in his determination at step three of the five step sequential analysis that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P., Appx. 1 and that such determination was not based on substantial evidence where Dr. Ruggiano offered no opinion regarding step three and, as to this component (c) of Plaintiff's Claim of Error No. 4, Recommends that the case be Remanded to the Commissioner for the limited purpose of allowing Dr. Ruggiaro the opportunity to review the post-hearing report of Dr. Padamadan and offer an opinion thereupon  in a manner deemed appropriate by the Commissioner.

**Plaintiff's Claim of Error No. 5:**

The Court finds that the ALJ did not err in not evaluating Plaintiff's condition prior to Plaintiff's October 1, 2007 application and as to Plaintiff's Claim of Error No. 5., the decision of the Commissioner is affirmed.

**Plaintiff's Claim of Error No. 6:**

The Court finds that substantial evidence does not support the ALJ's residual functional capacity assessment, adverse credibility finding, or step-five decision only as to the limited issue of the ALJ failing to articulate with specificity his rationale for discounting treating physician Dr. Rizk's October 2005 opinions, and, as to Plaintiff's Claim of Error No. 6, this Court Recommends that  this case is remanded to the Commissioner for the limited purpose of having the ALJ specifically articulate his assessment of the October, 2005 opinion of Plaintiff's treating physician. Dr. Tallat Rizk and what effect, if any, it may have on the ALJ's determination of Plaintiff's disability.

**Plaintiff's Claim of Error No. 7:**

The Court finds that substantial evidence supports the ALJ's evaluation of non-examining State-agency psychologist Dr. Wagner's December, 2006 opinions, and, as to Plaintiff's Claim of Error No. 7, the decision of the Commissioner is affirmed.

December 22, 2011

                                 /s/Vernelis K. Armstrong
                                 Vernelis K. Armstrong
                                 United States Magistrate Judge

**Notice**

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have ten (10) days after being served in which to file objections to said Report and Recommendation. A party desiring to respond to an objection must do so within fourteen (14) days after the objection has been served.

36

Please be further advised that the Sixth Circuit Court of Appeals, in <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals. In <u>Thomas v. Arn</u>, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.